GARDNER COWLES, Appellee, v. J. C. MARDIS COMPANY et al., Appellants, et al., Appellees.

**PRINCIPAL AND SURETY:** Defense to Bond—Matters Nonprejudicial.
1   The plea of a surety on a contractor's bond that the obligee was guilty of false representations because of having stated in instructions to bidders that he had entered into a contract under which the steel work was to be completed "within eight weeks from the time the foundations were ready," must fail when such a contract, though perhaps ambiguous, had been entered into when such steel work was entered upon, shortly after the foundations were ready, and when the contractor and surety knew at all times that any consumption of time on the steel work beyond said eight weeks would be automatically added to the time in which the general contractor was required to perform his work.

**PRINCIPAL AND SURETY:** Defense to Bond—Failure to Notify of
2   **Default.** A surety's plea, in an action on a building contractor's bond, that he was not, as required by the bond, notified of the different failures of the contractor to diligently carry on the work, by reason of which failures the contractor was excluded from the work, and the same was completed by the owner, must fail when the evidence revealed delay in the aggregate but no *definite and continuous* period of delay for which the contractor was charged with responsibility, and when the contract lodged in the architect the power to determine *what* delay would justify the exclusion of the contractor from the work,—of which final determination, the surety had due notice.

**PRINCIPAL AND SURETY:** Defense to Bond—Change of Contract.
3   The act of the owner in electing to have certain extra work done, as contemplated by a building contract, even though the election was after the time specified in the contract, does not constitute a change of the contract, with consequent release of the surety on the bond, when no extension of time of performance was given the contractor, and when the price of such extra work was determined in accordance with the contract covered by the bond.

**CONTRACTS:** Conditions—Failure to Produce Architect's Certificate.
4   In an action on a building contractor's bond, the fact that the owner was, under the terms of the contract, compelled to bring the action prior to the completion of the building, may be sufficient excuse for the failure of the architect to furnish a complete certificate of all the building items.

**CONTRACTS:**  Subject-Matter—Building Contracts.  Building contract reviewed, and held to justify judgment against the owner, his contractor, and the surety, for materials furnished, and that, in any event, the owner had no ground for complaint, as he was granted a right of recovery against the surety for the amount of all such claims.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

MARCH 15, 1921.

REHEARING DENIED DECEMBER 15, 1921.

ACTION in equity on a written contract, entered into between plaintiff as owner, and J. C. Mardis Company and J. C. Mardis, as sole proprietor of the Mardis Company, as general contractor, whereby the said contractor was to purchase all material and employ all labor necessary to complete, and to erect and complete an office building in Des Moines, Iowa, for plaintiff; and against the United States Fidelity & Guaranty Company, of Baltimore, on its bond, guaranteeing the performance of said contract by the contractor; and against a large number of persons furnishing labor and material entering into the construction of the building, under contracts made by them with the general contractor. The parties interested in the controversy, having or claiming liens against the property or liable in connection with the transaction, were made defendants, to the end that all the rights and liabilities of the respective parties interested might be determined. The result of the trial was that plaintiff was given judgment against the Mardis Company, Mardis, and the surety company for $45,539.72, made up of the following items:  $19,-354.03, the total amount for which the other defendants and cross-petitioners who furnished labor and material were given judgment against plaintiff and the Mardis Company; $23,185.69, the total amount of money expended by plaintiff in completing the building, over and above the amount agreed upon in the contract, after deducting all credits due the general contractor; and $3,000 damages for delay on the part of the general contractor, at $50 per day for 60 days, after deducting the number of days' delay for which the contractor was not chargeable. The surety company and Mardis have appealed, and plaintiff, in

a cross-appeal, appeals from the judgments rendered against him in favor of subcontractors or materialmen, and from the refusal of the court to allow him damages for more days' delay than was allowed.—*Affirmed on all appeals.*

*W. S. Ayres, Miller, Kelly, Shuttleworth & Seeburger,* and *R. E. Ball,* for appellants.

*Clark, Byers & Hutchinson, La Monte Cowles, John L. Gillespie, Read & Read, Henry & Henry, Sargent & Gamble, Halloran & Starkey, Roy Cubbage, Clem F. Wade, Brammer, Lehmann & Seevers, C. F. Maxwell, C. S. Bradshaw, F. T. Jensen, Price & Burnquist,* and *S. G. Van Auken,* for appellees. '

PRESTON, J.—J. C. Mardis Company is a trade name used by J. C. Mardis; and for the sake of brevity, we shall refer to the Mardis Company and Mardis as Mardis, or the general contractor; and the United States Fidelity and Guaranty Company will be referred to as the surety company or bonding company.

The record is a very long one, and we shall attempt to abbreviate and to avoid repetition by stating the issues, which alone take up nearly 100 pages of the abstract, and by stating so much of the contract provisions as seem to be material to the controversy, and by stating the more important facts in a general way, to a better understanding of the general situation, and shall then take up somewhat more in detail the claims, contract provisions, and evidence as to the different propositions.

There was a stipulation as to some of the facts, which covers several pages of the abstract. The amounts due the various laborers and materialmen were stipulated. As to some of the stipulated facts, the surety company objected to the materiality and relevancy thereof, and while admitting such facts as stated, it does not admit liability under such facts. As to other stipulations, it was admitted by defendants' that plaintiff and other witnesses, if called, would testify thereto, and that the defendants did not expect to controvert the same by evidence; but objections were reserved, which objections were made part of the stipulation. There is a conflict in the evidence at some points. We take it that the more important claim or defense, of the several de-

fenses interposed, is the claim that plaintiff falsely represented, in the written instructions to bidders, the fact as to what was the plaintiff's contract with the Morava Construction Company of Chicago, for structural steel, and that the truth in reference to this matter was not known to defendants until after the making of the contract with the general contractor and the giving of the bond. Upon such discovery, the surety company gave notice and attempted to cancel the bond, claiming that it was void from the time of the execution of the bond. Mardis makes the same claim as to the alleged misrepresentation as does the surety company. A further claim is that the steel construction company, under its contract with plaintiff, had a longer time to furnish the structural steel than represented, which delayed the completion of the building and carried the time into the winter months, when building operations were more expensive; and that this was the cause of the increased cost of the building and the delay in completion. Mardis, by way of counterclaim, asked judgment against plaintiff for $12,000 damages because of the misrepresentation, in that he was compelled to use tools and equipment for a greater time than would have otherwise been necessary, and for $15,000 commission; also asks judgment against plaintiff for any amount that might be found against Mardis on account of labor performed and material furnished on the building by interveners. The alleged false representation is the point most elaborately argued and apparently most relied upon by defendants for reversal.

The building contract was entered into on March 10, 1916; and Mardis, as principal, and the surety company, as surety, executed and delivered a bond for the faithful performance of the contract. Thereafter, Mardis entered upon the performance of the contract by purchasing material and employing labor. He failed to purchase the material or furnish the labor and prosecute the work as provided in the contract, or to pay for the labor and material required to complete the erection of the building, according to the terms of the contract. The second year's premium on the bond, $1,060.75, was paid May 16, 1917, and it was stipulated that the limit of time for bringing suit as specified in the original bond was extended to March 15, 1918. The suit was brought March 14, 1918, though the building was not entirely

completed, and could not be until about May 15, 1918. On July 21, 1917, the surety company denied any liability under the bond issued by it, and plaintiff alleges that by its repudiation it waived the performance of all conditions precedent on the part of plaintiff to entitle him to recover, and waived all matters in carrying out the contract between plaintiff and Mardis. On December 12, 1917, so plaintiff alleges, Mardis failed and refused to furnish labor and material for the completion of the building in accordance with the contract, and declined and refused to complete it. Thereupon, the architect, as provided in the contract, made the proper certificate, and plaintiff took charge of the work on December 15, 1917, after proper notice. Plaintiff entered upon the premises and took possession of the tools and appliances, and proceeded to procure labor and material to complete the building in accordance with the contract, which he says he did under provisions of the contract. Plaintiff was not the owner of the fee title to the real estate upon which the building was erected, but had a leasehold interest only. The contract price was not to exceed $212,150. Extras were provided for in the contract, and plaintiff required extras in the sum of $37,440.49. The undisputed evidence shows that, after plaintiff took possession of the work, in December, 1917, he expended $38,130.86, and we understand this to be the aggregate total paid by plaintiff in completing the building, and for extras. At the time the suit was brought, plaintiff alleged that he had paid out $272,404.62, and alleged that a further sum would be required to fully complete the building. Plaintiff alleged that he had no speedy and adequate remedy at law; that he had performed all conditions precedent by him to be kept and performed, to entitle him to recover against Mardis and the surety. He prayed that the rights of the respective parties and materialmen, whether liens had been filed by them or not, be fixed and determined by the court, and that he have judgment against Mardis and the surety company for the cost of the labor and material entering into the building in excess of the amount provided for in the contract; for damages for delays on the part of the general contractor in completing the work; for interest; for such other damages as plaintiff would be required to pay to complete the building; and for general equitable relief.

Mardis answered in general denial, but admitted the execution of the contract and bond; denies that plaintiff had performed the conditions required of him; says plaintiff wrongfully demanded and took possession of the building, and thereby prevented him from completing it; admits that the certificate of the architect of December 12, 1917, was served upon him, as was the notice from plaintiff, on December 15th; but says that the statements in the certificate of the architects were false, and so known to them, and that the certificate was made at the instance of plaintiff. He then sets up, by way of counterclaim, the matters before referred to.

The surety company, after making certain admissions and denials in Count 1, alleged, in Count 2: That, prior to the execution of the contract and the bond, plaintiff submitted to Mardis a writing known as instructions to bidders, which writing stated that:

"The owner has contracted with the Morava Construction Co., of Chicago, for all structural steel (except as noted below) erected in place eight weeks after the foundations are ready to receive it. Any delay on the part of the Morava Construction Company in completing their contract shall operate to extend the time of completion of the general contract, but the general contractor shall not claim damage on account of such delay.

"The company further alleged that this was believed and relied upon by Mardis at the time he made his bid and entered into the contract with plaintiff. Defendant further alleged that the contract with the Morava Company provided:

"Erection shall begin nine weeks after the architect's complete plans for the steel are delivered to the contractor, and foundations ready to receive the steel. The work of erection shall be carried on without interruption, and entirely completed within eight weeks."

Defendant alleged that Mardis did not know, at the time he entered into the contract, and defendant did not know, at the time of the execution of the bond, that the representations made by the plaintiff in its instructions to bidders, were false and untrue; that it and Mardis were misled and deceived; that it relied upon and believed that the work of the erection of the steel

could and would commence, and would be completed within eight weeks after the foundations were ready to receive it, and would, therefore, be completed at such a date that Mardis could perform the necessary work during the warmer months, and have the building inclosed by winter; that, because of such misrepresentation and the resulting fact that the Morava Company was not required to erect the said structural steel work during the warmer months, and that it was not completed until many weeks later than it otherwise would have been completed, Mardis was forced to do and perform his work during the colder months of the year, which made the work cost Mardis more than it otherwise would. The surety company further alleged that it did not know of the falsity of the representations made by plaintiff in the instructions to bidders until July, 1917; that, upon learning that fact, it immediately, and on July 21, 1917, notified plaintiff that it was misled and deceived by him in the manner stated, and that it elected to cancel and annul its said bond; that it notified plaintiff that the bond was of no force, and never had been; that it thereupon tendered to plaintiff (not Mardis, the principal), in writing, all sums of money which had been paid, to wit, $1,591.15, as the premium on said bond, which tender had been kept good. In a third count of the answer, the surety company alleged that Mardis, about the time he entered into the contract with plaintiff, learned of the matters just before stated, and that thereafter, either by agreement with plaintiff or by mutual acquiescence and consent between Mardis and plaintiff, Mardis proceeded with the work of constructing the building; but that the surety company had no notice of said misrepresentations or of such agreement or acquiescence until July, 1917; that, if said Mardis, by agreement, acquiescence, or consent, be held to have waived the matter of said misrepresentation of fact, it was done without the knowledge of or notice to the surety company; that, by reason thereof, plaintiff and Mardis, in effect and fact, altered the contract as originally entered into; and that, by reason thereof, the surety company is discharged and released. By an amendment to its answer, the surety company added additional counts, containing additional defenses. Count 4 alleges that, about July 19, 1917, plaintiff and Mardis altered and changed the obligations of the building contract, by agree-

ing that Mardis should furnish labor and material, and complete the eighth, ninth, tenth, eleventh, and twelfth floors of the building for the stipulated compensation to Mardis of the cost plus 5 per cent of said cost, and that said agreement was in lieu of Provision XXI of the original contract; that, on July 20, 1917, said agreement was put in writing, and signed by plaintiff, his architects, and Mardis, as follows:

"Confirmation of verbal agreement, made July 19th, 1917, that five per cent shall be added to the cost of the work covered by Article XXI of contract dated March 10th, 1916, such additional work to be done any time before . the contract is completed."

Said defendant alleged that thereafter, pursuant to said agreement, orders were given by plaintiff for the performance of said work, amounting to $20,000; that it had no notice or knowledge of such agreement, or of the orders, until the trial of this case began; that, by said Article XXI of the original contract, plaintiff was given the right to have said floors completed and finished, from the eighth to the twelfth floor, at a cost not to exceed $3,500 per floor, provided plaintiff exercised its option so to do before a certain date—which plaintiff did not do; that, by reason of the foregoing, the original contract was altered and changed in material particulars, without the consent of the surety company; and that it is thereby released. Count 5 alleged that plaintiff failed to give it notice of delay, and consequent default of the general contractor, as provided in the bond; that Mardis was guilty of default in the matter of delaying the progress of the work; that no notice was given it, except the notice of December 5, 1917, wherein the architects notified it that there had been a breach of the contract on the part of Mardis, in failing to diligently prosecute the work and in failing to complete the building; that Mardis did not pay for the excess cost of labor and material, but that he had refused to make such payments; and that he had advised the architects and the owner that he was unable to comply with his contract, and that the surety company would be held liable, under the terms of the bond. In Count 6, defendant alleged that plaintiff had paid the contractor his percentage, contrary to the terms

of the contract, and that this was done without the knowledge and consent of the surety company.

Replying to the matters alleged by Mardis and the surety company, plaintiff denies all matters alleged by them or either of them, as constituting an affirmative defense.

The bond is dated March 13, 1916, and is in the penalty of $63,500, and runs to Gardner Cowles, obligee. The principal and surety bind themselves, jointly and severally. It refers to the contract between plaintiff and Mardis, dated March 10, 1916, to erect and complete a twelve-story, mezzanine, and basement, business and office building, under the direction and to the satisfaction of Proudfoot, Bird & Rawson, the architects, according to the specifications prepared by the said architects, which contract and specifications are made a part of the bond. It provides that no liability shall attach to the surety hereunder unless, in the event of any default on the part of the principal in the performance of any of the terms, covenants, or conditions of the said contract, the obligee shall promptly, and in any event not later than 30 days after knowledge of such default, deliver to the surety at its office in the city of Baltimore written notice thereof, with a statement of the principal facts showing such default and the date thereof; nor unless the said obligee shall deliver written notice to the surety at its office aforesaid, and obtain the consent of the surety thereto, before making to the principal the final payment provided for under the contract herein referred to.

Second. "That, in case of such default on the part of the principal, the surety shall have the right, if it is so desired, to assume and complete or procure the completion of said contract; and in case of such default, the surety shall be subrogated and entitled to all the rights of the principal arising out of the said contract and otherwise, including all securities and indemnities theretofore received by the obligee, and all deferred payments, retained percentages, and credits due to the principal at the time of such default, or to become due thereafter by the terms and dates of the contract. That the surety shall not be liable for damages resulting from an act of God, etc., or by employees leaving the work being done under said contract on account of strikes or labor difficulties."

Other provisions of the bond not deemed material are omitted. The contract between plaintiff and Mardis provides, among other things, that the contractor, Mardis, was to purchase all materials and employ all labor necessary to complete, and would erect and complete, a twelve-story, mezzanine, and basement, fire-proof business and office building, on the property leased by the owner, and that the contractor was to furnish, at his own expense, all tools, machinery, and appliances necessary to erect said building and carry out the contract. All materials and work were to be as shown on the drawings and described in the specifications prepared by the architects, which drawings and specifications were made a part of the contract. It further provides:

"Article III. The owner, without invalidating the contract, may make changes by altering, adding to, or deducting from the work. No alterations, additions, or deductions shall be made in the work except upon written order of the architects; the amount to be paid by the owner or allowed by the contractor by virtue of such alterations to be stated in said order.   *   *   *

"Article V. The contractor shall employ all the labor and purchase all the materials necessary for the construction of the work. The owner agrees to advance to the contractor, from time to time, as the work progresses, money in sufficient amounts to meet the pay rolls, pay all material bills when due, and to discount all bills that are subject to discount.

"Article VI. The contractor agrees to perform all of the work contemplated by this contract to be by him performed, together with all of the duties incident thereto, for a sum equal to 8 per cent of the cost of the building, and guarantees that the total cost of said building, as hereinafter defined and including said 8 per cent, shall not exceed the sum of $212,150. If the total cost, including said 8 per cent, but not including extras, shall exceed the said sum of $212,150, then the contractor agrees to pay all excess over such sum. If said total cost, not including said 8 per cent, shall be less than $196,435.18, then he shall be paid a sum equal to 8 per cent of such total cost, and a further sum equal to 20 per cent of the difference between such total cost and the sum of $196,435.18. In addition to the foregoing, the contractor shall receive a sum equal to 8 per cent of all extra

cost incurred on account of additions or changes, after deducting from such extra cost all deductions or credits to be allowed by the contractor on account of changes whereby the cost has been lessened; and such extra cost shall not be computed in arriving at said total guaranteed cost of $212,150 or less. The contractor's percentage as above set forth shall be paid in four equal installments on the certificate of the architect, but the last installment shall not be paid until after the building has been completed in accordance with the contract and accepted by the architect.''

Article VII provides that it shall be the duty of the contractor to receive and check all materials as to quality and quantity.

"Article XII. Should the contractor refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, or be adjudged a bankrupt, such being certified by the architects, the owner shall be at liberty, after three days' written notice to the contractor, to provide any such labor or materials; and if the architects shall certify that such refusal, neglect, or failure is sufficient ground for such action, the owner shall also be at liberty, after three days' written notice to the contractor, to terminate the employment of the contractor for the said work, and to enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools, and appliances thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor; and in case of such termination, the contractor shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the total cost of the work to the owner shall exceed the guaranteed maximum cost of $212,150, then the contractor shall pay to the owner the amount of such excess. If the total cost, not including the 8 per cent, shall be equal to or less than the sum of $196,435.18, the contractor shall be entitled to any balance yet due him of the 8 per cent of said total cost, but from said 8 per cent shall be deducted any additional sums paid for superin-

tendence by the owner on account of the contractor's default. The expense incurred by the owner as herein provided, either for furnishing materials or for finishing the work, and any damage incurred through such default, shall be audited and certified by the architects, whose certificate thereof shall be conclusive upon the parties, and such damage shall be paid by the contractor to the owner.   *   *   *

"Article XV.   The contractor shall complete the several portions and the whole of the work comprehended in this agreement, on or before April 1, 1917.   It is agreed by and between the parties hereto that time is the essence of the contract, and the contractor agrees to pay to the owner $50 per day for each and every day the work remains unfinished after the time specified for completion; said sum may be deducted by the owner as liquidated and ascertained damages out of any balance due the contractor on this contract, and in case such balance is insufficient, the remainder shall, upon demand by the architects, be paid by the contractor to the owner.   Should the contractor be delayed in the prosecution of the work by the act, neglect, or default of the owner, of the architects, or of any other contractor employed upon the work by the owner, or by any damage caused by fire or other casualty for which the contractor is not responsible, or by combined action of workmen in no wise caused by or resulting from default or collusion on the part of the contractor, then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all the causes aforesaid, which extended period shall be determined and fixed by the architects, but no such allowance shall be made unless a claim therefor is presented in writing to the architects within 48 hours of the occurrence of such delay.   *   *   *

"Article XXI.   Should the owner on or before September 1, 1916, elect to have one or more floors above the seventh floor finished, the contractor agrees to furnish labor and materials, and complete any or all of the said floors, guaranteeing that this cost shall not exceed $3,350 per floor on the basis of the seventh-floor arrangement, including the contractor's percentage.   Such work to be done within the time herein specified for completion of the building.   Metal frames and sash shall be installed in the

rear part of the fifth and sixth floors, as provided in Article No.
2 of the bids."

It appears that, on December 4. ... C, t... ...
...ong some o" ... e workmen, w... h ... s ...
...ard.; and that, on April 2, 19 ., b. k       s
ers struck, causing the stone masons to stop work; and on the
4th, other workers joined. This strike was settled as to some ,
the workers on April 17th, but others held out until the 21st.
The architect testifies that they figured they were through with
Mardis's contract February 16, 1918; that they moved some
tenants in on that date on the upper floors; but that it was May
before all the floors were finished. Plaintiff testifies that the
steel men took longer than he thought they should; that there
were other delays; and that the whole work was not given the
proper oversight. Other witnesses, including some for the de-
fendant, say that the work dragged both in 1916 and 1917.
Mardis's foreman testifies that, when a job gets to dragging, it is
difficult to get it out of the habit; and that they thought they
had practically done that, but that the architect and plaintiff did
not think so. The contractor had large contracts at Camp Dodge,
and the Herring building, and perhaps others. Plaintiff says
he knew of these, but did not expect Mardis to neglect his job
for the others. There is evidence that not as much work can
be done in cold weather as in warm; that they laid off some on
account of cold weather, during the winter of 1916 and 1917;
that some of the men would not work in cold weather; and that
those who do, cannot make as much progress. A witness for de-
fendant who was assistant superintendent for Mardis testifies
that he went over the building about May 25, 1917, and found
Mardis pushing every line of work that it was possible to do,
and employing the maximum number of men under the condi-
tions, except where their work was delayed by other contractors;
that there was some delay in that month because the owner and
architects had not fully decided just what they wanted, and
the plans had not been fully decided on and furnished; that
changes were made; and that the contractor was requested to
hold off on certain work until after a decision had been made
as to changes. The superintendent and engineer for Mardis,
testifying for defendant, says that, in his opinion, the building

could have been finished within the contract time if the steel
had been erected within eight weeks from the time the founda-.
tions were completed and ready for the steel; that, because of
this, the concrete work and inclosing of the building were thrown
into the winter time; that the delay of the steel work was the
cause of other delays; that they followed the steel work as fast
as it was possible; that the delay of the steel, causing the other
delays, naturally made excess cost over the contract price; that
the steel men completed their work and left about January 1,
1917; that, when the cold weather commenced, in the fall of 1917,
some of the building was inclosed—one or two stories; that they
expected to have the building plastered by cold weather; that
the rest of the work was inside work, which could have gone
forward, with the heating apparatus that would go with the
building; that the workmen would have been housed, and could
have worked along during the winter. Mardis gave similar testi-
mony, and that there was some delay in the work on the ninth
floor, to allow time to decide how they wanted the partitions.
The memorandum on architects' Order No. 25 states that they
thought they had rented the ninth floor to one company. The
same order, dated July 25, 1917, notified the contractor to com-
plete the ninth floor in a certain way, and the memorandum
states that the architect desires that the work on the seventh
floor be rushed. He says further that all the money received
from plaintiff went to pay bills for the building, except $12,000
of his per.entage, which was paid to him in three equal install-
ments; that the first he knew of the claim of the Morava Company
as to their contract construction was in October or November.
A representative of the surety company testifies that the first
the ompany knew of that was about two weeks before July 21,
1917; that he thereupon tendered back the premium; that the
ʼy not es received by the company of the claimed default
of the Mardis contract were those of December 5, 15, and 19,
1917.

1       The first and more important point relied upon by both
Mard s and the surety company is as to whether there was such

1. PRINCIPAL AND       a false representation as they claim, relied upon
   SURETY: defense      by them to their prejudice. Both appellants con-
   to bond: matters
   nonprejudicial.      tend that there was a material misrepresenta-

tion in this: that there was a statement in the instructions to bidders that a contract had been entered into with the Morava Construction Company by which the steel was to be erected within 8 weeks from the time the foundations were ready to receive it; whereas such contract did not require the steel to be erected until 17 weeks after the foundations were ready to receive it. They cite *United States v. Utah Stage Co.*, 199 U. S. 414, 424; *Hollerbach v. United States*, 233 U. S. 165, 171; *Capital City Brick & Pipe Co. v. City of Des Moines*, 136 Iowa 243; *Slusser, T. & Co. v. City of Burlington*, 47 Iowa 300; *Bank of Monroe v. Anderson Bros.*, 65 Iowa 692; *Lingenfelter Bros. v. Bowman*, 156 Iowa 649, 652; *Selma Sav. Bank v. Harlan*, 167 Iowa 673, 677; *Barnes v. Century Sav. Bank*, 149 Iowa 367, 375.

These cases hold to the general doctrine that a false representation or concealment or deception as to a material fact, tending to deceive or mislead a surety to his damage, by increasing the risks of the undertaking, vitiates the contract and releases the surety. In the *Bank of Monroe* case, it was said that whether the obligee, before accepting the undertaking of the surety, and without being applied to by him for information on the subject, is bound to inform him of facts within his knowledge which increase the risks of the undertaking, depends on the circumstances of the case. We deem it unnecessary to indulge in any extended discussion of the cases, for the reason that we do not understand plaintiff to dispute the legal proposition. Their contention is that there was, in fact, no representation prejudicial to the defendants.

There are some additional facts bearing upon this point, not heretofore set out, to which it will be necessary to refer. The plaintiff made arrangements for the steel a considerable time in advance, doubtless due to conditions then existing. At any rate, the contract with the Morava Company for the furnishing and erection of this steel was made in April, 1915, and the complete plans and specifications delivered to it at that time; and the steel was all, or substantially all, fabricated and ready for erection during the year 1915. It is true that, at one stage of the work, the Morava Company did claim that the language of the contract gave it 17 weeks in which to complete the erection of the steel after the foundations were ready to receive it. This

question first came up in October or November, 1916, when Mardis claims he first knew of this claim on the part of the Morava Company. The work of erecting the steel was actually begun June 22, 1916, so that the controversy arose after the 8 weeks in which, under the contract, the work should have been completed, and at a time when it was well along; for it was completed December 30, 1916. The surety company claims that it did not have knowledge of the Morava Company's claim as to the interpretation of the contract until a later date. When this controversy arose, in October or November, the matter of the construction of the Morava contract was discussed between Mardis, the architect, plaintiff, and his attorneys. Some of them claimed that it meant 8 weeks, the Morava Company claimed 17 weeks, and the attorneys claimed that the contract was ambiguous. It appears that an endeavor was made to get jurisdiction of the Morava people in this state, so that the contract might be reformed; but the court held that jurisdiction could not be obtained in the way attempted. The plaintiff claimed that the Morava agreement or contract was, in fact, that the Morava Company should begin the erection of the steel when the foundations were ready to receive it, and that the erection of such steel should be completed within 8 weeks from that date. After discussion, plaintiff and Mardis agreed that neither of the parties would waive any of their rights, and the steel construction proceeded to completion. This being so, it seems to us that plaintiff and Mardis thus confirmed the contract, rather than altered it, as Mardis and the surety company now contend. After all, it seems to us that the controversy was merely a matter of interpretation of the language used in the instructions to bidders and in the Morava contract. Both Mardis and the surety company knew, from the beginning, what was in the instructions to bidders. They so say. They knew from the instructions to bidders that the owner had contracted with the Morava Company for all structural steel to be erected in place 8 weeks after the foundations were ready to receive it. This is the language of the Morava contract. They knew too, from the instructions to bidders, that "any delay on the part of the Morava Construction Company in completing their contract shall operate to extend the time of completion of the general

contract, but the general contractor shall not claim damages on account of such delay." So that, under this provision, both Mardis and the surety company knew that, whatever the delay after the work was commenced, whether 17, 20, or 25 weeks, such delay operated to "extend the time of completion of the general contract;" and knew that "the general contractor shall not claim damage on account of such delay," even though the time was extended into the winter months, and the cost consequently increased. There is another circumstance which we think has an important bearing at this point, and that is that the foundations were completed and ready to receive the steel about June 7, 1916. There was a short delay thereafter, but the work of erecting the steel by the Morava Company actually began in a few days. Under both the instructions to bidders and the Morava contract, this work was to have been completed within 8 weeks thereafter, but with the provision in the instructions to bidders, before set out, that whatever delay there might be should operate only to extend the general contract, and without damage for the contractor. The steel construction could not have been commenced before June 7th. The language in the Morava contract as to the 9 weeks could have application, if at all, only to a time before the foundations were ready for the steel. Either plaintiff or the architect,—we are unable to tell which, from the amended abstract,—testifies that the Morava Company never contended that they had the right to 8 weeks after the foundation was completed, in which to commence work, and then 9 weeks to complete the erection. "They never said that to me; they never claimed that of us." Mardis and the surety company, on the trial, proceeded on the theory that the written instrument between the Morava Company and plaintiff is final and conclusive as to what the agreement was. Plaintiff contends that defendants have proceeded to unfairly interpret it in their favor, and that this interpretation is not borne out by the contract. It is appellees' contention that the Morava Company was to have 9 weeks, after receiving the complete plans and specifications, in which to begin the erection of the steel, provided that the foundations were ready to receive it, and that the company was to have 8 weeks from the time the foundations were ready to receive the steel, in which to complete

its erection. The Morava contract provides that the work of erection shall be carried on without interruption, and entirely completed within 8 weeks. It seems to us that this means that, when the work of erection is once started, it shall, from that time forward, be carried on without interruption, and entirely completed within 8 weeks from the time such work is begun. The instructions to bidders recite that it has made a contract with the Morava Company for all structural steel, erected in place 8 weeks after the foundations are ready to receive it, and contain the further provision that delay shall extend the general contractor's time, without damages. The instructions to bidders were a part of the plans and specifications, which were made a part of the general contract. The work of erecting the steel on the foundations was begun June 22, 1916, and should have been completed in 8 weeks from that time, which would be about August 17th. This being so, if the contract with the Morava Company had been complied with by it, the work of the general contractor would not have been carried into and over the winter of 1916 and 1917. As said, the delay of the construction company extended the Mardis contract, and he was to receive no damages. Conceding that the delay of the Morava Company operated to delay the work of the general contractor, the contract signed by plaintiff and Mardis disposed of the rights of the contractor under such circumstances, and in the manner provided in the instructions to bidders. This provision determines the right of the general contractor on the contract guaranteed by the surety, for delays occasioned by the Morava Company. There might be some question whether the surety company could rely upon the alleged false representation in the instructions if the Morava contract was ambiguous, and susceptible of two constructions. But in any event, the statement in the instructions to bidders that the owner has contracted with the Morava Construction Company, of Chicago, for all structural steel (except as noted below), erected in place 8 weeks after the foundations are ready to receive it, was not a false statement. It follows that there was no misrepresentation such as to avoid the contract of suretyship. The surety would not be justified in canceling its contract for this reason, and its attempted cancellation was and is ineffective. This disposes of the claim of both

Mardis and the surety company in regard to this matter. What has been said also disposes, adversely to the surety company, of the contention of said company that there was an agreement between plaintiff and Mardis altering the contract, at the time the controversy arose as to the construction of the Morava contract, either by express agreement, or by acquiescence.

2. It is next contended by the surety company that it is released because the plaintiff did not comply with the first provision of the surety contract, as pleaded by plaintiff, in that the

<div style="margin-left:2em">

2. PRINCIPAL AND SURETY: defense to bond: failure to notify of default.

</div>

plaintiff did not promptly, or within 30 days after knowledge of the default of Mardis in delaying the work, give it written notice, etc., prior to the notice in December, 1917. It will be convenient to consider together this point and plaintiff's claim that the court did not allow it enough for delay. It seems to us that the surety company is driven to an inconsistent position as to this. Up to this point, it has claimed and insisted strenuously, as has Mardis, and their evidence is to the effect, that, without any question, the only delay was occasioned by the Morava Company. But to sustain the point now under consideration, they contend that Mardis was responsible for other delays, and that there was, therefore, a default on his part, of which plaintiff did not notify the surety. Some of defendants' witnesses say that the work did drag somewhat, and plaintiff's evidence tends to so show. One of defendants' witnesses testifies that anyone in close touch with the work on this building knows that there are a number of delays that are beyond anyone's control, and that no one part of the construction held up the others. Defendants' evidence further tends to show, as we have already stated, that Mardis was pushing the job, and using all the men he could to advantage. There is a conflict in the evidence. By plaintiff's contract with Mardis, the whole of the work was to be completed on or before April 1, 1917. It was not completed for a year thereafter. Concededly, there was delay somewhere, and some of it may have been without the fault of anyone. Unquestionably, some of the delay was due to the Morava Construction Company, but that fact operated to extend the time, and the trial court did not charge Mardis or the surety company with such delay, but it was deducted from

the number of days claimed for by plaintiff. Plaintiff claimed that it should receive the $50 compensation for 147 days. The trial court allowed for 60 days, at $50 per day. It is difficult to determine with exactness just how much should be allowed. Without going into the evidence further as to this point, we state our conclusion that we think the trial court made a proper allowance.

Going back to the claim of the surety company. The language in the bond that no liability should attach in the event of any default might, by a strained construction, mean the driving of a nail improperly. We suppose no one would contend that that would release the surety, nor would delays for which no one was responsible. The very purpose of the bond was to indemnify plaintiff for the default of the general contractor. We said, in *Bartlett & Kling v. Illinois Surety Co.*, 142 Iowa 538, at 554, that manifestly the surety cannot rely upon the default of the principal which he promised he would not make. Article XVII of the contract between plaintiff and Mardis, which contract is a part of the surety company's bond, contains provisions in regard to the contractor's duty to proceed diligently with the work, and provides that, if the architects shall certify that his refusal, neglect, or failure is sufficient ground for such action, the owner may terminate the employment, and take possession of the work. It was a matter somewhat for the architect to determine. He was on the ground, and knew the conditions, the delays, and causes therefor, and who, if anyone, was to blame. Plaintiff alleges that, about December 12, 1917, Mardis failed and refused to proceed in accordance with the terms of the contract, and that thereupon the architects gave notice to Mardis thereof, and authorized and directed plaintiff to take charge of the work and complete the building, which he did, all in accordance with the contract.

It would be difficult, from the evidence, to pick out a definite, continuous period of delay, outside of the delay occasioned by the Morava Company; though, as said, the evidence of plaintiff does tend to show that the work dragged at times, during both 1916 and 1917. Extensions of time were permitted, under the contract, under certain conditions.

Appellant surety company cites *Bankers Surety Co. v.*

*Watts,* 118 Ark. 492 (177 S. W. 21), *Astoria Southern R. Co. v. Pacific Surety Co.,* 68 Ore. 569 (137 Pac. 857, 862), and *Wainright Trust Co. v. United States F. & G. Co.,* 63 Ind. App. 309 (114 N. E. 470, 473), at this point. In the first named case, the contractor failed to complete a building by a certain date, which failure constituted a breach of the contract, under the terms of which it was the duty of the owner to give notice within ten days thereafter. The object of the notice was to enable the surety seasonably to take action to protect itself. Under the facts of that case, the court held that the failure to complete the building by the date specified constituted a default on the part of the contractor, of which the surety company was entitled to notice, under the provisions of its surety contract. Though the contract in the instant case provided that the building should be completed by a certain date, there were provisions, as stated, that the time should be extended to the principal contractor. The facts of the other cases cited are dissimilar, and may be distinguished from the facts in the instant case. We do not understand appellant to contend that plaintiff did not, in all respects, comply with the provisions of the bond and of the Mardis contract, after Mardis had refused, in December, 1917, to proceed, and after plaintiff and the architects began steps to take charge of the work. The bonding company was notified, upon the first notice or certificate from the architect, that Mardis was delaying the work, contrary to the terms of the contract, and so as to constitute a breach thereof.

3. A twelve-story building, basement, etc., was to be erected, under the contract; but if plaintiff desired to have one or more floors above the seventh floor finished, the contractor should do so. Article XXI of the contract provides for an election by plaintiff, on or before September 1, 1916. At that time, the steel construction was not completed, and was not completed until December 30, 1916, some four months after plaintiff was to make the election. It is conceded that plaintiff did not make such election by September 1, 1916. The matter was covered July 19, 1917, and reduced to writing on the 20th, by an order on the contractor, signed by the architects and by Mardis and approved by plaintiff, which is as follows:

*3. PRINCIPAL AND SURETY: defense to bond: change of contract.*

"Order No. 23.

"Agreement for Extra Work.

"July 20, 1917.

"J. C. Mardis Company,
    "City.
"Gentlemen:                      Re Register & Tribune Bldg.
    "Confirmation of verbal agreement made July 19, 1917, that
5 per cent shall be added to the cost of the work covered by
Article XXI of contract dated March 10, 1916. Such additional
work to be done any time before the contract is completed. 5
upper floors $3,350 plus 5 per cent. In accepting this order for
extras or deductions it is agreed by the contractor that the time
for completing the building shall not be extended unless ex-
pressly stated in the order and that this order shall not in any
way alter the terms of the contract. When this order constitutes
an original contract it is understood, unless otherwise distinctly
stated, that it covers the furnishing of all labor, material, and
apparatus necessary to deliver, install, and complete the work
named. The contractor must verify all measurements at the
building, and report any seeming errors before executing the
work. All work and materials shall be the best of their respec-
tive kinds and subject to the approval of the architects. The
contractor shall be responsible for all violations of building
laws and regulations. The contractor shall be responsible for
all damages to the premises and for the safety of his own work
until its acceptance, and he shall remove all his rubbish.
    "Accepted: J. C. Mardis Co., J. C. Mardis, Contractor.
                        "Proudfoot, Bird & Rawson.
"Approved: Gardner Cowles."

It is the contention of the surety company that this was an
agreement without its knowledge or consent to alter the con-
tract, and that thereby it was released. On this point, they
cite *Ward v. Haren,* 139 Mo. App. 8 (119 S. W. 446); *Missouri
Bridge & Iron Co. v. Stewart,* 134 Mo. App. 618, 621; *Judah
v. Zimmerman,* 22 Ind. 388; *Beers v. Wolf,* 116 Mo. 179 (22 S.
W. 620). The first two cases hold, in substance and effect, that
a contractor may not be held to the time limit by an owner, with-

out an allowance of the time made necessary for changed conditions of the work by the requirement of additional work, and so on. In the *Ward* case, the contractor was free to make alterations or do extra work, at the suggestion of the builder, for additional compensation, or to decline to do so, as he saw fit. The court said that there are cases where the owner has reserved to himself, by the contract, the power of ordering alterations or extra work on the building, and the contractor is obliged to perform such orders, without the right to demand an extension of time for the completion of the work; and that, in such a case, the doctrine obtains, where the owner orders additional work which the contractor may not refuse to do, and thus delays the completion of the building, that the act of the owner in thus ordering extra work operates to waive or extend the time within which the building should be completed; that the law, in refusing to tolerate the exaction of that which is impossible, implies relief from the obligation as to time; and that the exercise of an arbitrary power by the owner, which would result in mulcting the contractor in damages for failure to complete the building within the time, is not permissible. In the *Judah* case, a second contract was entered into, by which an additional story was to be put on the building, and another contract was entered into, extending the time for its completion. The court held that these were material changes of the original contract for which the surety company had given bond.

We think the cases are not applicable. The contract and the facts are not similar to the instant case. There was no agreement for an extension of time, and the order of the architects, though not made until after September 1, 1916, provided that the work of finishing the upper floors should be done before the building was completed. Other provisions of the contract provide for extras. A completion of a part of these floors was required under the terms of the contract; but under the order of the architect of July 20, 1917, the agreement for extra work, Mardis was required to perform the work covered by Article XXI, and such additional work, under the architects' order, was to be done at any time before the contract was completed. This covered five extra floors, at the compensation therein fixed and agreed upon. The work was ordered as extra work, and

further, for additional compensation for the work than that stipulated in Article XXI. Extra work is authorized and provided for in Article VI, which also makes provision for agreement between the parties as to the price of said work; and this is the contract of which the surety company has guaranteed the performance on the part of Mardis. As to alterations and repairs, and the agreement as to the price, under the principal contract, it is stipulated that the principal contractor and the owner, or the architect, could agree upon the price to be paid for extra work required.

4. The next contention of the surety company is that the action of plaintiff in taking over the building from the contractor in December, 1917, in accordance with Article XII of the contract, as plaintiff claims, was wholly unjustified. This involves a consideration of the evidence. Some of the evidence bearing upon the failure of the contractor to proceed in the performance of the contract has been referred to. It would serve no useful purpose to detail the evidence. We think the evidence shows that the order was justified.

4. CONTRACTS: conditions: failure to produce architect's certificate.

5. It is contended by appellant surety company and Mardis that no competent evidence was offered by plaintiff to prove his damages for furnishing material or finishing the work, for the reason that the same had not been ordered and certified by the architect in accordance with the expressed provisions of the contract; and hence that, there being no competent evidence of such damage, the contractor is not liable to the owner; and that, if the contractor is not liable, the surety is not. The part of the contract relied upon at this point is the latter part of Article XII, which provides that:

"The expense incurred by the owner as herein provided, either for furnishing material or for finishing the work, and any damage incurred through such default, shall be audited and certified by the architects, whose certificate shall be conclusive upon the parties, and such damage shall be paid by the contractor to the owner."

As before said, the architects did issue proper certificates in December, and they issued a certificate as to the number of days for which plaintiff was entitled to damages for delay; but as to

other matters in the provision just quoted, no certificate was produced. On this, appellants cite *McNamara v. Harrison,* 81 Iowa 486, 490; *Edwards v. Louisa County,* 89 Iowa 499; *Ross v. McArthur Bros.,* 85 Iowa 203; *Miller v. Mason City & F. D. R. Co.,* 132 Iowa 412; *International Cement Co. v. Beifeld,* 173 Ill. 179 (50 N. E. 716); *American Bonding & Tr. Co. v. Gibson County,* 127 Fed. 671. Counsel for plaintiff cite no authority on this proposition, and their argument is very brief in regard to it.

As we understand the claim, or one of the claims, of these appellants, it is that, from the cases cited, the action is prematurely brought, and the suit may not be maintained until the certificate is produced. If it is the claim that the action should abate, then we do not find that defendants have pleaded the matter in abatement.

Plaintiff contends that all conditions precedent have been waived by these appellants and by the surety company, by its repudiation and attempted cancellation of the bond and its claim that it was void from the beginning, because the claimed cancellation was on other grounds. On this, appellee cites *Carson v. German Ins. Co.,* 62 Iowa 433; *Boyd v. Cedar Rapids Ins. Co.,* 70 Iowa 325; *Elliott v. Home Mut. H. Assn.,* 160 Iowa 105; and other cases. Plaintiff contends, also, that no other ground can now be urged in defense, except the alleged misrepresentation as to the Morava contract, citing *Wood v. Hall,* 138 Iowa 308; *Prichard v. Mulhall,* 140 Iowa 1, 9; and other cases. These cases are cited as a waiver of all conditions precedent to be kept and performed by the plaintiff. To this the surety company responds that a waiver is a voluntary relinquishment of a known right (citing cases), and that the surety company did not know of the alleged misrepresentation relied upon, until the work was partly completed.

We shall not discuss the matter as to whether there was a waiver, since we have, in prior divisions of the opinion, held that the other defenses were not sustained. Nor shall we go into the question of the waiver as to the point under consideration in this paragraph, preferring to place the decision upon other grounds. The cases cited hold that, where the contract makes the production of the architect's certificate a condition pre-

cedent, such production is necessary unless a sufficient reason or excuse, or waiver appears. The contract, or that part of it now under consideration, does not expressly make such a certificate a condition precedent. 9 Corpus Juris 757 lays down the rule that such a provision is binding, where the contract either expressly or impliedly makes a reference to arbitration or to a certificate, decision, or estimate of an architect a condition precedent to the right of the builder to recover compensation, or unless the obtaining of such is excused or waived. There may be some question whether the provision quoted impliedly makes the certificate a condition precedent; but conceding, for the sake of argument, that it does, then we have the question as to whether plaintiff was excused, or whether there was a sufficient reason for not producing the certificate. The bond of the surety company provides that the surety company should not be liable to any action instituted later than July 1, 1917; and when the second year's premium was paid, this time was extended to March 15, 1918. Under this provision of the bond, suit must have been brought, as it was, before that date. At that time, the building had not been completed. There were one or two items amounting to $500 or $600, necessary to complete the building. This being so, the plaintiff could not produce a certificate covering completely and exactly all the items. The building was completed at a later date, and accepted by the owner and the architects. The architect was a witness in the case, and testified as to the expense and as to the matters referred to in the quoted part of the contract before set out. The surety company objected to the facts admitted in the stipulation, because not material or relevant; and to the testimony of the architect, the objection was that it called for the conclusion of the witness, and that it was incompetent, irrelevant, and immaterial. At the last of the testimony of the architect, the further objection was made that this was an improper manner in which to prove the matter at issue, and incompetent for that reason. But this last mentioned objection was in regard to whether plaintiff and Mardis agreed on the correction of one item. The specific objection that no certificate was presented was not made.

Without taking further time at this point, we think that, under the entire record, the action should not abate, nor should

the failure to produce the certificate operate as a bar to plaintiff's recovery. The amounts allowed by the trial court are not in serious dispute; indeed, they are, for the most part, stipulated.

6. The next contention on the part of the appellant surety company is that the court erred in overruling its motion to require plaintiff to elect whether he would proceed solely against it, or solely against the other defendants; and that, if plaintiff refused to elect, the court should strike from the petition the alleged cause of action against the other defendants. The thought is that, as to the surety company, this was an action at law. No motion was made to transfer the cause to the law docket. The other defendants are not complaining that the court refused, on motion of this defendant, to strike the cause of action of the other defendants. Whether this was the proper remedy, we need not determine. There is no argument at all on this point by plaintiff, and appellants' argument is very brief. No cases are cited. The motion recites that if, in this suit, plaintiff should procure a judgment against Mardis, then, upon the failure of the surety company to fulfill the conditions of its bond, plaintiff could sue at law on the bond. The several defendants and cross-petitioners could, perhaps, also bring separate suits against Mardis and plaintiff. The theory of plaintiff was to bring in all parties having any interest, that all might be bound, and to prevent a multiplicity of suits. On this particular feature of the matter, the surety company does not argue that this may not be done.

7. It is contended by the surety company that the excess cost of the building, over and above the amount named in the contract, was caused by plaintiff, or by those under his supervision; and that, therefore, plaintiff cannot recover against Mardis or against the surety. Mardis makes the same claim, and that the excess cost was the result of the false representation before referred to, and that he was entitled to recover compensation and damages asked by him in his counterclaim. Some of the matters before set out have a bearing on this. We shall not go into the evidence further, but content ourselves with saying that such claims by the defendants are not sustained.

8. Finally, the plaintiff, as cross-appellant, complains that

the trial court erroneously entered judgment against him in
favor of cross-petitioners for labor and material which went into
the building, which labor and material were fur-
nished by cross-petitioners, under their con-
tracts with Mardis.    Such defendants, other
than Mardis, asked judgment against Mardis, plaintiff, and the
surety company, and that mechanics' liens filed in their behalf
be established on the building.    The contest in regard to this is
between plaintiff Cowles and the cross-petitioners.    As to some
of the cross-petitioners, judgment was entered in their favor
against Mardis and the plaintiff; and as between Mardis and
plaintiff, judgment was rendered in favor of plaintiff against
Mardis to the amount for which judgment was entered against
Cowles; and their liens were established.    As to the Standard
Glass & Paint Company and three other cross-petitioners, whose
liens were not filed in time, a personal judgment was entered
against Mardis and plaintiff, Cowles, on the theory that Mardis
had purchased the material from the cross-petitioners which
entered into the building covered by the contract between Mardis
and plaintiff, Cowles.    As to these, judgment was also entered
against Cowles, on the theory that, under the contract between
Mardis and plaintiff, Cowles, Cowles was the principal and
Mardis the agent or employee.    As to the glass company and
the three others, their claimed liens were not established.    None
of the cross-petitioners furnishing labor and material have
appealed.

It is thought by plaintiff that the court erred in finding
that the contract between plaintiff and Mardis constituted a con-
tract of agency or employment.    The claim is that Mardis was
an independent contractor, and that the cross-petitioners were
subcontractors under Mardis.

As to the first class of cross-petitioners above referred to,
whose liens were established, there is no controversy.    The cross-
appellant concedes that their claims were rightly established,
and concedes that the questions involved by plaintiff's cross-
appeal are immaterial, except as they enter into the rights of
plaintiff and Mardis and the surety company.    The claim is that
the judgments in favor of the last class of cross-petitioners were
erroneous; that, since they have not appealed from the refusal

*5. CONTRACTS:
subject-matter:
building contracts.*

of the trial court to establish liens in their favor, if they recover at all it must be upon the theory, as this appellant says, that the contract between plaintiff and Mardis made plaintiff the principal and Mardis his agent or employee, for the purchase of labor and material from cross-petitioners.

There are some provisions in the contract between plaintiff and Mardis which may have a bearing upon this feature of the case, and which have not before been set out. We have before referred to Article I of the contract, by which Mardis was to purchase all materials and employ all labor necessary to complete a twelve-story building, and by which he agreed to furnish, at his own expense, all the tools, machinery, etc., necessary. Article X provides in part, and substantially, that the contractor agrees that he will not purchase any materials for use in the construction of the work unless or until the prices and quantity have been approved by the owner, and that he will furnish to the owner a statement of all prices of all materials he proposes to purchase, except that the contractor shall have the right to make small purchases, from time to time, without submitting prices, but not exceeding $350. Article XI provides substantially that the contractor is to take all necessary precautions and safeguards against the happening of accidents, and that he will be responsible for them and will indemnify and save harmless the owner from the payment of damages that may occur in or about the work, etc. Article XIII provides that, upon the completion and final acceptance by the owner, and upon payment by the owner to the contractor of the account then due and owed to him, the contractor will execute a release to the owner of all claims, etc. Article V, heretofore set out, provides that the contractor shall employ all the labor and purchase all the materials, and the owner agrees to advance to the contractor, from time to time, money in sufficient amounts to meet the pay rolls and pay all material bills when due, etc.

As said, it is conceded that the labor and material furnished by cross-petitioners went into the building. It is urged by the glass company, and the argument applies to other cross-petitioners now in controversy, that whether or not the contract between plaintiff and Mardis was strictly an agency contract, by its terms, plaintiff was at all times primarily liable for the

material purchased by Mardis, under the original contract; and that. Mardis was not an independent contractor. We take it that Mardis would be liable to these cross-petitioners, because he made a contract with them. We do not understand that anyone claims otherwise; so that, as said, the question is whether plaintiff, Cowles, is liable to cross-petitioners, under the original contract between Cowles and Mardis. The cases hold that there may be a dual character or relation in some cases, without necessarily creating a repugnancy or inconsistency; that, as to some parts of the work, a party may be a contractor, and yet be a mere agent or employee, as to other work. 14 Ruling Case Law 76. In the recent case of *Love Bros. v. Mardis*, 189 Iowa 350, the contract in some respects was quite similar to the contract in the instant case. But in the cited case, Article VI of the contract provides that the owner appoints the contractor his duly authorized agent, for the employment of all labor and purchase of all material, etc. In that case, we held that personal judgments were properly entered against both the principal and agent, where the agent ordered goods in his own name for his principal's benefit, and where the principal received the benefit because the labor and material went into the building. We shall not again refer in any detail to the provisions of the original contract. Though the contract between plaintiff and Mardis was for the erection of the building, under the terms of the contract, for the performance of which contract the surety company bound itself, still there was no fixed contract price for the completion of the building, and the owner reserved some control, especially as to purchasing materials and as to employment of labor which went into the owner's building, such as these cross-petitioners are claiming for. As between plaintiff and Mardis, in regard to Mardis's contracts with materialmen, briefly repeating, among other provisions of the contract we find that plaintiff, under his contract with Mardis, was to advance the money in sufficient amounts to meet the pay rolls and to pay all material bills; purchases by Mardis were to be with the approval of the owner, which would not be necessary if Mardis were strictly an independent contractor; and the owner reserved the right to determine the rate of wages, under certain circumstances. Plaintiff received the benefit of the labor and

material furnished by these cross-petitioners, under their contracts with plaintiff's contractor, Mardis. Plaintiff has judgment against the surety company for the amounts adjudged against him, in favor of these cross-petitioners.

We think plaintiff has no just cause of complaint, and the judgment and decree are affirmed on plaintiff's appeal.—*Affirmed on all appeals.*

EVANS, C. J., WEAVER, STEVENS, ARTHUR, FAVILLE, and DE GRAFF, JJ., concur.