## LYTLE v. McALPIN.

### No. 11912.

Court of Civil Appeals of Texas.
San Antonio.

Jan. 26, 1949.

Rehearing Denied March 3, 1949.

Palmer & Lemons, of San Antonio, and Alfred M. Scott, of Austin, for appellant.

Kleberg, Eckhardt, Mobley, Lockett & Weil, of Corpus Christi, for appellee.

NORVELL, Justice.

J. W. Lytle, defendant below, has appealed from a judgment in the sum of $524.52 rendered against him and in favor of E. A. McAlpin. McAlpin did some concrete and brick work on appellant's house and contended that Lytle was liable to pay him for such material and services.

In December of 1944, Lytle and E. M. Carey entered into an oral agreement under which certain additions and improvements were made to a residence owned by Lytle. Carey engaged McAlpin to do a part of this work. Upon the trial McAlpin contended that, under the agreement between Lytle and Carey, Carey became Lytle's agent and was authorized to obligate Lytle for the payment of the services and materials furnished by him. Lytle, on the other hand, denied that Carey was his agent, but contended that Carey was an independent contractor. For a discussion of agreements relating to independent contractors as opposed to agents, see the recent case of Williams v. Texas Employers' Ins. Ass'n, 218 S.W.2d 482 decided by this Court on December 1, 1948.

The trial judge's findings and conclusions were favorable to McAlpin. The trial judge found that:

"Under the terms of the contract Carey was agent for Lytle to engage and hire sub-contractors and to furnish labor and material necessary for and incident to said construction.

"That E. A. McAlpin was one of the sub-contractors so engaged by said Carey within the authority and scope of Carey's agency to furnish labor and material in the execution of construction work contracted for.

"That E. A. McAlpin furnished work, labor and materials to Lytle as a sub-contractor on this construction."

The trial judge concluded as a matter of law that:

"Carey, by virtue of his contract with Lytle was the agent of Lytle and as such was authorized to and did bind Lytle to pay to McAlpin the price contracted Carey on Lytle's behalf for the labor and materials furnished to Lytle by McAlpin and he, Lytle, is therefore, bound and obligated to the said McAlpin in the sum of Five Hundred Twenty-Four and 52/100 ($524.-52) Dollars."

Appellant's points, inter alia, present the contention that the evidence is insufficient to support the trial judge's findings.

█ Appellee does not rely upon a mechanic's or materialman's lien, but upon the alleged agency between Lytle and Carey. McAlpin was not present when the agreement was made. Lytle contended that he had an agreement with Carey to do a certain piece of work at a certain price. We must, however, accept Carey's version of the agreement in view of the trial judge's findings. According to Carey, who was appellee's witness, he had been doing some work for the Pete Murrays, who were neighbors of the Lytles. Carey testified that Mrs. Lytle first approached him with reference to building a sun porch. Later a garage, closet and servant's quarters were included in the conversations. Carey said he would do the work on the same arrangement he had with Murray.

Carey, on direct examination, testified as follows:

"Q. Well, was it your agreement with them to do either the total of these jobs you have testified to for a definite figure or on a cost plus basis? A. Cost plus, not a definite figure.

"Q. Was that definitely agreed upon? A. I don't know as it was agreed on at that time but I would say they knew that was how I was doing it. I told them to begin with I would do it just the same as I was doing Pete Murray's."

On cross-examination Carey testified:

"Q. Can you tell us substantially what was said? A. Well, he (Lytle) said what he wanted me to do and what they had talked about doing, and that was building that room and he told me thereafter to summarize or get it approximately what it would cost him.

"Q. Did you tell him what it would cost? A. No, I didn't. I told him approximately what it would cost. * * *

"Q. Did you prepare an estimate? A. Yes, sir, an approximate estimate.

"Q. Did you tell him you would do the complete job for any sum? A. No, I didn't, no, sir.

"Q. What did you tell him about that servants quarters? A. I told him do it same as the others, cost plus. We never made no contract.

"Q. What did you say to Mr. Murray—to Captain Lytle? A. I told him I would do it like I had done Pete Murray's that was cost plus.

"Q. Did you ever mention cost plus to him? A. I don't know whether exactly I did or not.

"Q. You don't know whether you did? A. I couldn't say whether I did or not.

"Q. After you accepted this job who was in charge of it? A. I was.

"Q. You were in complete charge of it? A. Yes, sir.

"Q. Did Captain Lytle ever tell you when to come to work? A. No, sir.

"Q. Ever tell you when to leave? A. No, sir.

"Q. Did he ever tell you when to go to lunch? A. Well, he didn't ever have to do that.

"Q. I mean you were in complete charge of that work? A. I was.

"Q. And you were supposed to deliver a complete job? A. I was under his orders and he could turn me off any time he wanted to because I was working for him.

"Q. He didn't tell you when to come to work? A. He didn't have to tell me because if I didn't go to work he wouldn't have paid me. * * *

"Q. All right, you had charge of the hiring and firing of men that worked there? A. I did. They worked for me.

"Q. Captain Lytle had nothing whatsoever to do with it? A. I was the boss. * * *

"Q. When were you supposed to complete the work out there? A. There was nothing said about that.

"Q. And you didn't say anything about cost plus to Captain Lytle, did you? A. Well, in—

"Q. Just answer my question. A. I don't know whether I did or not.

"Q. Well, do you swear that you did? A. Huh?

"Q. Do you swear that you did? A. I don't."

From the above statement, it will be seen that the evidence relied upon to support the theory that Lytle and Carey entered into a "cost plus" contract is very meager, and the testimony is clearly insufficient to establish that Carey was Lytle's agent. Appellee, however, contends that "a contractor under a 'cost plus' contract is the agent of the owner." It appears that the form of "cost plus contract" prepared by the American Institute of Architects does, with reference to certain matters, provide for this relationship. Smith v. Sanders, Tex.Civ.App., 128 S.W.2d 160; Moody-Seagraves Ranch, Inc., v. Brown, Tex.Civ.App., 69 S.W.2d 840, but it does not follow that because certain types of "cost plus" contracts do create the relationship of principal and agent, that all "cost plus" agreements are agency contracts.

In Smith v. Sanders, Tex.Civ.App., 128 S.W.2d 160, 162, the Galveston Court of Civil Appeals, following a procedure similar to that adopted in Moody-Seagraves Ranch, Inc., v. Brown, Tex.Civ.App., 69 S.W.2d 840, stated the controlling question involved as follows:

"The main question to be determined in this appeal is, whether, under the terms of said contract, the said John L. Haden was an independent contractor for a finished job for a certain stipulated sum or whether this is a 'cost plus' contract in which the contractor became the agent of the owner and the owner became directly responsible to appellee who furnished the labor and materials for said repairs."

In stating this question the court did not hold that agency is a necessary incident to all "cost plus" contracts. Agency as between the owner and the contractor may or may not be an element of a "cost plus" contract. This seems evident from the two cases above mentioned, as well as the case of Dallas National Bank v. Peaslee-Gaulbert Co., Tex.Civ.App., 35 S.W.2d 221, 224. The opinions in each of the three cases discuss at some length the various contractual provisions involved and arrive at the conclusion that the contractor became the agent of the owner. For instance, in the Peaslee-Gaulbert case (which is cited in the two other opinions mentioned), it is said:

"We have given to the terms and provisions of this contract, separately and collectively, careful consideration, and through our analysis, in the light of the following decisions, have reached the conclusion that same created the relationship of principal and agent between the contracting parties thereto: Gilbert Mfg. Co. v. Connellee, Tex.Com.App., 265 S.W. 375; North Carolina Lbr. Co. v. Spear Motor Co., 192 N.C. 377, 135 S.E. 115; Cowles v. J. C. Mardis Co., 192 Iowa 890, 181 N.W. 872.

"By the terms of said contract, it is clear that the hiring of employees and subcontractors was contingent upon the approval of the architects, Coburn-Smith & Evans, undoubtedly the agents of appellant; all employees were to be discharged by order of the architects. In the matter of cutting into the walls or foundation, such work was to be done under the supervision of the architects; when it should appear that more detailed instructions were required, it was necessary for the contractors to call upon the architects for same, and at any time the architects were empowered to criticize, refuse, and cause to be done over any particular work of the original contractors, or subcontractors. It was provided that, if any employee working on the building should slight his work in any degree, upon instruction from the architects such employee should be discharged. The architects were authorized to pass upon the quality and quantity of all workmanship and materials, and, in addition to the above, there was reserved to appellant the power to substitute

and change the kind of materials used, and to change the manner of doing the work."

In this case, it is apparent from the testimony above quoted and from which the provisions of the contract must be gathered, that there were no provisions agreed to between appellant and Carey from which it could be reasonably inferred that Carey became the agent of Lytle and Lytle became directly responsible to McAlpin who furnished labor and materials for the job at the instance of Carey.

From what has been said, a reversal of the judgment follows. We are of the opinion that the ends of justice will be better served by a remand. We need not discuss certain additional contentions contained in appellant's brief, as the foregoing sufficiently indicates our view in the event of another trial.

The judgment appealed from is reversed and the cause remanded to the trial court for further proceedings not inconsistent with this opinion.

Reversed and remanded.