Argued March 29; reversed April 28, 1950

## HANN ET AL. *v.* HANDY

217 P. (2d) 763

*Clifford S. Beckett,* of Oregon City, argued the cause for appellant. On the brief were Butler, Jack & Beckett, of Oregon City.

*W. W. McKinney,* of Salem, argued the cause and filed a brief for respondents.

Before Lusk, Chief Justice, and Brand, Belt, Bailey and Latourette, Justices.

BRAND, J.

This is a suit by the plaintiffs doing business as the Capital Electric Company, against the defendant Handy, who was the owner of one Refrigerator Dairy Products Display Case which was located in the defendant's store in Woodburn. The complaint alleges that between 29 July 1948 and 4 August 1948, defendant was the owner and in possession of said display case and that while in possession thereof and between said dates, the plaintiffs furnished labor and material to the defendant in the construction, alteration and repair of the display case. It is alleged that said labor and material "were furnished by plaintiffs to the defendant at the special instance and request of J. R. Burton, the duly authorized agent for such defendant"; that the reasonable value thereof was $417.05, none of which has been paid, except the sum of $85.00; that the balance of $332.05 is owing from defendant to plaintiffs, and that plaintiffs duly filed a verified notice of lien upon chattels. The complaint seeks a personal judgment against the defendant and a decree foreclosing the alleged lien in the amount due with interest costs and attorney's fee. The answer denied the foregoing allegations. After trial, the court entered the decree foreclosing the lien for the above amounts but did not grant any personal judgment against the defendant who now appeals.

The notice of lien states that the labor and materials were furnished at the request of J. R. Burton, the authorized agent for the owner. Among other defenses

the defendant claims that he entered into an agreement with Burton as an independent contractor and that he paid to Burton the contract price in full. Under these circumstances, he contends that Burton was not the authorized agent of the defendant and could not create any right to a lien in the plaintiffs who were Burton's subcontractors.

The suit was brought pursuant to the provisions of O. C. L. A., § 67-601, etc. Lowell W. Hann and his wife are the plaintiffs and operate the Capital Electric Company. For convenience, we shall refer to Lowell Hann as the plaintiff. He testified as follows:

"Q. * * * Were you employed by some person other than Mr. Handy to go to Woodburn? A. Yes.

"Q. By whom were you employed? A. Burton.

"Q. That is J. R. Burton? A. Yes.

"Q. What capacity did he have, if you know? A. He was—is—the agent, I suppose, of Mr. Handy.

"Q. What was Mr. Burton's business? A. He was building display cases and so forth, and he had no means of getting the refrigeration done, so he called on us.

"Q. Did you take the job? A. Yes.

"Q. And what did you do? A. We went ahead and installed the refrigeration equipment in this system."

The defendant and Burton executed a written contract, a true copy of which is as follows:

"The Burton Refrigeration Co.

"Manufacturers and Distributors

"3050 Portland Road—Salem, Oregon—Phone 2-4060

Date June 7, 1948

"Name Handy Market (Ernest Handy)

"Address Woodburn, Ore.

"Ship Via

"Terms: Contract

| "No. | Model | Specifications | Price |
|------|-------|----------------|-------|
| 1 | 10′ | Open Self-Service Refrigerated Case | |
| 1 | 20′ | Open Self-Service Refrigerated Case | |
| 1 | | Corner case Stainless Steel Back-Bar to match Cases. | |
| 1 | | Heavy duty 1/2 h. General Electric Compressor | |
| 1 | | One horse Copeland to be used for 20′ of Refrigerated case. These Cases to be equiped with 24 Cage Stainless steel back-bars - Baked E n a m e l Fronts & Ends trimmed with stainless steel — Plate glass mirors. Floresin lights (30 ft. These Cases Manufactured by (Burton Refri. Co.) All Materials No 1 & gara. workmanshish) | |
| 1 | | Super Cold Reach-in Refrigerator | |
| 1 | | 12 ft Frozen food Case less Compresor Taken In trade | |
| | | "Total price | 1850.00 |
| | | "Deposit | 500.00 |
| | | "(Bal on delivery) | 1350.00 |

"Signed    Ernest W. Handy
"Address 311 Front St    Woodburn Ore
"Salesman J. R. Burton"

The contract is indorsed "Paid In Full 7-6-48 J. R. Burton". The defendant also introduced in evidence a bill of sale signed by Burton, conveying to the defendant:

"One 30-ft. Open Self-Service Refrigerated Display Case Equipped with a One Horse Copeland Compressor and one 1/2 horse Gen Elec Motor"

The plaintiff and two of his employees did the work. Under date of 2 August 1948 three statements were prepared by the plaintiff covering work and material furnished in equipping the defendant's display case. All three are on printed forms of the Capital Electric Company. Each of them reads as follows:

"Sold to Burton Refrigeration
"Address 1802 N. Front
"City Salem".

The first statement is for labor at Handy's Market "on display case". It shows the hours worked and prices charged. The second statement is for material in display case at Handy's Market, stating the price therefor, together with a credit for payment on material in the sum of $85.00. The third statement is a summary of the first two. The undisputed evidence is that the $85.00 was paid to the plaintiffs by Burton. Thus the written evidence shows an original contract between the defendant as owner and Burton as contractor for the entire installation including the electrical work done by the plaintiff, and full payment by defendant to Burton in the sum of $1850, and it also shows that plaintiffs claimed payment from Burton of the balance remaining unpaid by Burton in the amount of $332.05 which is the amount sued for. The relationships appear to be those of owner, independent contractor and subcontractor. We turn to the verbal testimony.

A part of the work incident to the installation involved the overhauling of a Copeland unit of a frozen food case belonging to Handy which was taken by the plaintiffs to their shop to be repaired and then installed in the new refrigerator display case. Plaintiff testified that he made a demand upon Handy for the amount due and talked with him personally. On being asked to tell what was said, plaintiff testified:

"A. Well, I know we discussed the matter of payment. I don't remember just what was said exactly. Burton seemed to be a little slow.

"THE COURT: It isn't a question of Burton. It is a question of what Handy said.

"A. Handy was very interested that we continue the job and he said he would see that we were properly taken care of."

It is admitted that it was Burton who originally came to see the plaintiff about the work to be done. Plaintiff had started work before he had any conversation with the defendant Handy. The plaintiff testified concerning the Copeland refrigeration unit in defendant's frozen food locker, which was out of order, and stated that the defendant wanted this completely reconditioned before installing the new case. We quote:

"Q. * * * Do you mean you had a conversation with Mr. Handy prior to the time you ever commenced work, concerning this job? A. No, we had started on the job all right. We had disconnected this unit and after that, I think it was the second time we were there. I had gone there once before and closed the valves and disconnected the unit, and the next time I came over they insisted on this unit being overhauled and reconditioned. I believe, if I remember right, Mr. Handy and Burton were both there at that time.

"* * *

"Q. Mr. Burton had previously contacted you and told you he wanted you to work on this job? A. Yes, he said he had this case he wanted this refrigeration unit installed in at Handy's store.

"Q. You made a statement that Mr. Burton was Mr. Handy's agent. Did anybody ever tell you he was Mr. Handy's agent? A. Well, Mr. Handy told me that Burton had built this case for him, so I naturally would assume he was his agent.

"*    *    *

"A. I was out to Mr. Burton's shop previous to the time we started working and Mr. Handy and Mr. Burton were both there, before the case was taken over to Woodburn, and the three of us discussed the matter, and Mr. Handy was very anxious to get this done as soon as possible.

"Q. How do you know that? A. Well, I talked with him and he asked me when I could do it and I said, 'As soon as Burton got the case over there.' "

The arrangements for payment were made between the plaintiff and Burton. We quote further from plaintiff's testimony:

"Q. Did you ever send anything to Mr. Handy prior to the notice that you were filing a lien? A. I went over to see him in person and talked to him about it.

"Q. What did he tell you at that time? A. He was going to see Mr. Burton about it.

"Q. Didn't he tell you at that time he had made an agreement with Mr. Burton for the purchase of the case and that he had paid Mr. Burton and that he had never had any agreement with you? A. The last time I believe he did say he had purchased the case from Burton and felt that he was not responsible for it, although he had authorized us to go ahead and overhaul this unit, this one horse Copeland unit.

"*    *    *

"A. Well, I had had a conversation with Mr. Handy and he said, 'I wish you would hurry and get this done as soon as possible, and I want you to overhaul this unit.' He gave us authority to overhaul it and one of his men helped us load the unit in the truck. It was too heavy for me. I was alone that day. As far as having a written statement, I didn't have a written statement. It was just that they authorized me to do this work.

"Q. The original order was placed by Mr. Burton, was it not? A. Yes, the original order on installing refrigeration in this case, although Mr. Handy had asked me to overhaul this unit, and I asked Mr. Burton if that would be all right and he said, 'I suppose it should be overhauled'.

"Q. You asked Mr. Burton's approval before you went ahead with the work? A. Well, they were both together there. The three of us were talking together."

The plaintiff testified that when he talked with the defendant concerning pay, the defendant said: "that he had paid Burton and that he would try to see that Burton paid me so I wouldn't be out anything."

Defendant testified that he bought the display case from Burton and that he never knew the Capital Electric Company existed until they came and started to work. He had no conversation with the plaintiffs prior to the ordering of the display case. He testified further that his only conversation with the plaintiff was when:

"I told him I paid for the case and if he got any money he would have to look to Burton Refrigeration Company because that is the people I signed an agreement with, and he would have to look to them for his money."

Defendant does not recall any conversation with the plaintiff concerning a contract. He testified that he

saw both the plaintiff and Mr. Burton at Burton's place of business, and added:

"A. * * * I knew Burton expected him to do some of the work. I saw them at the place together, but I never knew what company he represented.

"Q. And did you order Mr. Hann to do any work at the time you saw him at Mr. Burton's place of business? A. No, I didn't.

"Q. When was the first time you knew the Capital Electric Company was the organization to do this work? A. I think the first time I knew that was when a man came up and served a lien on the case."

The defendant testified:

"Q. Now, some reference was made concerning the overhauling of a motor that was already in your place of business. What was the arrangement concerning that, and with whom? A. When I bought— made the contract with Burton Refrigeration Company to purchase this big cabinet, I told Burton at the time that this big horse and a half or one horse motor—I believe it was a horse and a half—I had in the frozen food cabinet, needed some repair work on it, and he said, 'I will see that the motor is put in good condition so you won't have anything to worry about when this new case is set in the store.'

"Q. And that was part of your contract, the overhauling of that motor, with the Burton Company? A. I don't believe it was a written contract, but it was a verbal contract I had when I bought the case, that I should have the motor repaired and put in good condition, so it would handle this part of the job, that it added 20 feet to our refrigeration case.

"Q. That was to be paid for by the compensation you were paying the Burton Refrigeration Company? A. That is right.

"Q. Did you pay them for the construction of this case and overhauling this motor? A. I paid Burton Refrigeration Company.

"Q. What did you pay them? A. I paid $1,-800.00, and I also gave him two cases in conjunction with it, as our agreement reads."

Inspection of the written contract shows that the defendant's Copeland unit was in fact to be installed in the new case as part of the contract.

The undisputed evidence shows that the defendant paid Burton $1,800 as payment in full. The defendant explained that the "One horse Copeland" referred to in the contract already belonged to the defendant but was inserted in the contract because Burton was supposed to repair it in order to operate the new display case. Defendant acknowledged receipt of a letter under date of 23 August 1948, signed by the attorney for the plaintiffs, stating that a lien had been prepared for filing for services performed "at the request of Mr. J. R. Burton". Further notice threatening immediate foreclosure of the lien was sent to the defendant on 17 September 1948. On cross-examination, the defendant said: "I am quite sure he was employed by Mr. Burton. He was not employed by me." He added that he did not hire Mr. Hann. A letter of 26 August 1948, signed by counsel for the plaintiffs and addressed to counsel for the defendant was received in evidence. It states:

"* * * Mr. Burton is insolvent and that is the reason that it was necessary to file this lien. I am advised by my client that Mr. Handy did pay Mr. Burton for the work that was done, but we are not able to get any money from Burton and must file a lien and foreclose unless it is paid."

Mr. Burton as a witness for the defendant testified

that he received $1,850 from the defendant, which payment was to include the construction of the case and the overhauling and installation of the one-horse motor that Mr. Handy already had. He also testified that he ordered the work which was done by the plaintiffs; that in doing so he was acting in his own behalf and that so far as he knew the defendant had nothing to do with the arrangements for the work with the plaintiff company. Burton also testified concerning the agreed price which the plaintiff was to receive from Burton. Burton testified further that he agreed with the plaintiffs that the plaintiffs would take payment in certain built-in equipment which plaintiffs were to accept and use on another job. Burton testified that in addition to the $85.00 paid to plaintiffs, they received three refrigeration Freon gas drums.

The case at bar must not be confused with cases which are brought under the Mechanics' Lien Law. The last-mentioned statute, O. C. L. A., § 67-101 gives a lien to every mechanic, builder, contractor, laborer and other designated persons:

"* * * for the work or labor done or transportation or material furnished at the instance of the owner of the building or other improvement, or his agent; and every contractor, subcontractor, architect, builder or other person having charge of the construction, alteration or repair, in whole or in part, of any building or other improvement as aforesaid, shall be held to be the agent of the owner for the purpose of this act; . * * *".

The statute involved in the case at bar, O. C. L. A., § 67-601, contains no provision making the contractor the agent of the owner. It gives a lien to one who has expended labor, skill or materials "at the request of its owner, reputed owner, or authorized agent of the owner,

or lawful possessor thereof * * *''. Before Burton could be held to be the agent of the owner in the case at bar, it would be necessary that the relationship of principal and agent, as known to the common law, be proven. We find no such agency in this case. On the contrary, we think the evidence establishes that Burton was an independent contractor. The plaintiff's case, as set forth in the complaint, and in the notice of lien, rests upon the statement that the plaintiffs furnished labor and material at the request of J. R. Burton, the duly authorized agent of the defendant. There being no such agency at common law, and no statutory agency, the case, as stated by the plaintiffs must fail for want of proof.

The plaintiffs' brief suggests other grounds for recovery, not mentioned in the pleadings or in the notice of lien. It is argued that the lien is valid because of some direct relationship between the plaintiffs and the defendant. We have reviewed the evidence upon which this claim depends and are of the opinion that even if the plaintiffs had plead a direct contractual relationship between themselves and the defendant, or had plead that the defendant was estopped to deny such a relationship, the evidence preponderates against any such claim of contractual relationship or of estoppel. The evidence tested by well-recognized principles establishes that Burton was an independent contractor upon a written contract, having neither actual nor ostensible authority as an agent to bind the defendant. This statute received careful consideration in the case of *Ross v. Spaniol et al.*, 122 Or. 424, 251 P. 900, 259 P. 430. In that case the court said:

"* * * It is clear, therefore, that this statute did not intend, except so far as changed by statute,

to create a lien unknown to the common law, and that it merely intended to preserve the right to a lien which existed at common law, and at the same time to dispense with the necessity of the lienors retaining possession of the chattel until compensated for the work done, as well as to extend the right to a lien in the cases mentioned which did not exist at common law. For that reason in interpreting the language of this statute, it should be interpreted in accordance with the principles of the common law.

"* * *

"* * * It was equally well settled that the lien of a workman at common law belongs strictly to the person contracting to do the work or service, and not to the subcontractors or persons employed under him * * *".

Again the court said:

"* * * As so used, the words 'lawful possessor,' were intended to designate a person who is authorized under the statute to have the work done, but not a person who himself has contracted to do the work.

"* * * A party, being in the lawful possession of a chattel and contracting for its repair, is by this statute vested with authority to make such contract, but a party who has contracted to make the repairs has no power under this statute, to pledge the property in his custody."

The decision was cited with approval in *McKinley et al. v. Tice et al.*, 129 Or. 190, 276 P. 1110, in a suit to foreclose a lien upon lumber. The cases cited by the plaintiffs upon this issue are not in point.

The case of *Cowles v. J. C. Mardis Co.*, 192 Iowa 890, 181 N. W. 872, arose under the Mechanics' Lien Law of Iowa, Compiled Code of Iowa, 1919, Sections 6507, etc. It expressly provides that all persons fur-

nishing materials or doing work shall be considered subcontractors except such as have contracts directly with the owner, his agent, or trustee, and it is further provided that subcontractors may file liens. The case is cited for the proposition that:

"* * * there may be a dual character, or relation, in some cases, without necessarily creating a repugnancy or inconsistency; that as to some parts of the work a party may be a contractor, and yet a mere agent or employee as to other work. * * *"

Assuming, without deciding, that there may be such a dual character, we hold that the evidence fails to establish any such situation in the case at bar. Since the plaintiffs were not entitled to a lien under the law and evidence, the decree of the circuit court is reversed.