JEITZ, Plaintiff v. FLEMING, et al., Appellants v. BENTON, Respondent

(217 N.W.2d 868)

(File No. 11331. Opinion filed May 17, 1974)

**Bangs, McCullen, Butler, Foye & Simmons, Thomas E. Simmons**, Rapid City, for defendants, third party plaintiffs and appellants, Berdell Fleming and Dennis Fleming.

**LaFleur & Lehnert, Robert F. LaFleur**, Rapid City, for defendant, third party plaintiff and appellant, Fall River Feed Lots, Inc.

**Lynn, Jackson, Shultz, Ireland & Lebrun, Kelton S. Lynn**, Rapid City, for compulsory cross claimant, third party defendant and respondent.

DUNN, Justice.

This action was originally commenced by Larry Jeitz on January 7, 1972, as plaintiff against Berdell Fleming, Dennis Fleming and Fall River Feed Lots, Inc., hereinafter referred to as Feed Lot, defendants. Thereafter, Anthony Benton was joined as a defendant by a third party complaint and he in turn cross claim by Benton against the Flemings and the Feed Lot. The Jeitz case was later settled and the cross claim by Benton against the Flemings and the Feed Lot came on for trial on April 19, 1973. This resulted in a verdict for the cross complainant, Benton, against all of the defendants and it is from this verdict that the defendants now appeal.

The incident giving rise to this litigation occurred on September 25, 1971. The location of the collision was some ten miles east of Hot Springs, South Dakota, at an intersection where a road known as the Oral Road intersects with a graveled road which goes to the Fall River Feed Lots. Jeitz and Benton had been working for a farmer in the area where the accident took place hauling silage to the Feed Lot. They were proceeding to their employment at the time of the accident. Benton was driving the automobile and Jeitz was a passenger. They were proceeding east on the Oral Road which is a hard surfaced highway. At the time of the accident, Dennis Fleming was hauling silage to the Feed Lot in a truck owned by his father, Berdell Fleming. He was proceeding west on the Oral Road above described. The evidence indicates that Dennis Fleming had started to make a left-hand turn below the crest of the hill toward the road leading to the Feed Lot. The collision occurred on the south shoulder of the highway at the top of the hill where the above mentioned intersection is located.

The first question to be decided is whether the Flemings were independent contractors or employees of the Feed Lot at the time of the accident. In this regard we are only concerned with the relationship as it pertained to the hauling of the silage with the Flemings' truck. To best understand the legal significance of this relationship, some preliminary factual foundation must be laid.

The Flemings (father and son) operated a farm close to Oral, South Dakota. The father was also employed at the time of the accident by the Feed Lot as a silage cutter. The Feed Lot was in the business of feeding other people's cattle until they were ready for market, and it should be noted that the Feed Lot bought or contracted for all the feed it used in the operation. Feed Lot had contracted for corn to be grown and cut for silage on several farmers' land and it was the gathering of this silage that was in progress at the time of the accident. The Flemings, as well as 16 other farmers with individually owned trucks, had contracted to haul silage from the farm to the Feed Lot at a per-ton mileage price. Berdell Fleming had a unique relationship with the Feed Lot. He was employed to cut silage and he had also contracted his truck to haul silage. The two operations seemed to be separate

and' distinct as the evidence shows the Feed Lot had others employed as cutters and quite a few others under contract to haul silage, but this unique relationship must be considered in deciding the legal relationship that existed. Dennis Fleming was hired by Berdell Fleming without any consultation with the Feed Lot.

The respondent Benton contends that Berdell Fleming was a "vice principal" of his master, the Feed Lot, and in the direction of his son in the hauling operation, was not an independent contractor. The appellant Feed Lot, on the other hand, contends that Berdell Fleming acted in a dual capacity and as to the hauling of the silage the Flemings were independent contractors. No South Dakota cases were found on the question of a dual relationship, but in Cowles v. J. C. Mardis Co., 192 Iowa 890, 181 N.W. 872, the court stated:

> "there may be a dual character, or relation, in some cases, without necessarily creating a repugnancy or inconsistency; that as to some parts of the work a party may be a contractor, and yet a mere agent or employee as to other work."

41 Am.Jur.2d, Independent Contractors, § 2, p. 739 also considers this question and states:

> "While generally the existence of the relation of independent contractor and employer, as between two given persons, excludes the relation of principal and agent, or master and servant, nevertheless there is not necessarily such repugnance between them that they cannot exist at the same time with regard to different portions or phases of the work. A person may be an independent contractor as to certain work, and a mere servant, employee, or agent as to other work for the same employer not embraced within the independent contract. Moreover, the relation of master and servant might be found not to exist between certain persons for the purpose of one legal problem, say, respondent superior, and yet the relation might be considered to exist between the same persons at the same time for some other purpose, such as unemployment compensation. In cases where such concurrent existence is established,

however, the enforceability of the claim, whatever it may be, depends upon whether, at the time when the circumstances to which the claim has reference supervened, the person employed was acting in the capacity of an independent contractor, servant, or agent."

The testimony of both Berdell Fleming and Mr. Largent, proprietor of the Feed Lot, was to the effect that Berdell Fleming was employed by the Feed Lot as a corn cutter at the rate of $3.50 per hour; that he was paid weekly and that withholding and social security was withheld from his checks; and that in this position he was subject to the orders and control of the Feed Lot at all times.

The testimony of Mr. Fleming and Mr. Largent was also to the effect that there was a separate and distinct agreement whereby Mr. Fleming agreed to haul the silage (along with some 16 other truckers) at so much per-ton mile from the field to the Feed Lot; and to be paid for the hauling when the job was finished, with no withholding for taxes or social security; that Mr. Fleming was free to hire and fire his drivers and pay them as he saw fit and that these drivers were never on the Feed Lot payroll for any purpose. This seems to fit the dual relationship set out in Am.Jur.2d, supra, and the cases cited thereunder. Likewise, the argument that Berdell Fleming was a "vice principal" because of his employment as a corn cutter must be dismissed in view of the completely separate contracts involved here.

Considering the hauling contract alone, there seems to be no conflict in the basic facts, although there is considerable disagreement as to the legal interpretation of the facts. Certain evidence concerning the hauling contract is not subject to different interpretations. The Fleming truck was hired to haul silage until the silage was all in the Feed Lot; it was being paid for on a ton-mile basis with total payment to be made at the end of the contract; Berdell Fleming owned the truck and he maintained the truck and paid for all gas, oil and repairs; Berdell Fleming hired the driver without any consultation with the Feed Lot; neither of the Flemings was on the Feed Lot payroll in connection with the hauling operation; no withholding or social

security taxes were withheld on the payment for the hauling operation; neither of the Flemings was carried .on the Feed Lot payroll for Workmen's Compensation in connection with the operation of the Fleming truck. The Feed Lot was not in the hauling business and made a regular practice of hiring their hauling done by others. The Flemings were not in the hauling business either, being farmers for the most part, but they had contracted to haul the Feed Lot silage along with some 16 other farmers owning trucks. All of the elements set out in Instruction No. 11 and which were taken from the Restatement, Agency, § 220, have been answered by the above evidence except (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) and a somewhat similar test as to whether the occupation in that locality was usually done under the direction of the employer or only by a specialist under supervision; and (3) whether the parties themselves believed they were creating the relationship of master and servant.

In connection with the latter element of what the parties believed, the trial court sustained an objection by Benton, to questions directed to Mr. Fleming and Mr. Largent as to their understanding of the oral agreement on the grounds that it was hearsay and that he (Benton) was not present when the oral conversation took place. In view of the Instruction later given as to what the parties believed, being an element in deciding the question of the master-servant relationship, the trial court was in error in sustaining these objections. The conversation should have been allowed at least for the purpose of providing the belief of the parties as to the relationship. Accordingly, while we can draw inferences from other evidence as to the belief of the parties, there is no direct testimony from either Fleming or Largent as to what they thought the relationship was at the time of the accident.

This leaves the issue of control and direction of the work which respondent claims to be the principal factor in determining the relationship of employer-employee or independent contractor. This Court in numerous cases has recognized "control of details of the work" as the important element in determining the relationship. Halverson v. Sonotone Corp., 71 S.D. 568, 27 N.W.2d 596.

However, the Court has indicated that the control element must be viewed in relation to its application in each case. Thus, in Dumire v. Martin, 84 S.D. 572, 174 N.W.2d 215, we stated that "each case must be determined on its own facts and all features of the relationship must be considered." Also in Steen v. Potts, 75 S.D. 184, 61 N.W.2d 825, this Court stated:

"The circumstances of a case may reveal other outstanding features which tend to support an inference that one working for another is an independent contractor."

This case also recognized the tests set out in Instruction No. 11 from the Restatement, Agency, § 220, as being helpful.

In view of these principles, let us examine the control exercised in this case according to the evidence which is not in material conflict. The facts indicate that the Feed Lot did the silage cutting and selected the farm where the corn was ready to be cut for silage. It is contended by the respondent that this gave the Feed Lot control over the details of the work as the trucks could only haul silage that had been cut, and they could only do so by the shortest route from the farm to the Feed Lot as the truckers were being paid on a ton-mile basis. Counsel for the Respondent in one of his objections referred to this as direction by "economic compulsion".

We find no basis for this theory in the cases cited. This would not differ from a situation where a moving van was hired to haul a person's furniture from Huron to Pierre. The van had to pick up the furniture at Huron and had to proceed on Highway 14 as it was the best and shortest route to Pierre. Yet no one would claim that the moving van was other than an independent contractor. Instruction No. 11 defines an independent contractor as follows:

"An independent contractor is one who carries on an independent profession, business or trade and who contracts to serve his employer's desires only as to the result to be accomplished, not as to the details of method whereby the result should be attained."

Berdell Fleming contracted to haul the Feed Lot silage from the farm to the Feed Lot and to be paid for his hauling at so much per ton-mile. The only control of the Feed Lot was as to the result to be attained. Fleming retained control of the truck, the driver, and the manner in which the hauling was done. The Feed Lot wanted the silage moved and the Flemings agreed to move it. That is the end result of this agreement.

One last contention of the Respondent should be examined and that is the testimony of Mr. Largent as to his right to dismiss a trucker if he felt the corn silage was not being hauled properly. The sum total of testimony on this subject is hereby set out:

"Q If you had a trucker that you employed that you were dissatisfied with, you felt you could discharge him anytime during that period, did you not?

A We could discontinue his hauling, yes. If he needed to be discharged, yes.

* * * * * *

Q Well, would you explain to the Court, Mr. Largent, what you meant in connection with Mr. Lynn's question to you with reference to discharge of a trucker.

A If a man is not wishing to do a proper job in his line of work to accomplish the objective, then he cannot cooperate with the Feed Lot, the cutter operators or the farmer, and he would have to be discharged or released from any agreement that we had to haul the material because we like a good working relationship. Under those grounds we felt like that we could discontinue the use of the man plus also I would like to add that if at any time he did not want to appear, did not want to haul or decided to go elsewhere, he was free to do so at any day."

While the authority to hire and fire employees has been held to be an important factor in some cases, it is not a controlling

issue here. In view of all of the evidence pointing to the fact that Berdell Fleming was an independent contractor in the whole hauling operation, the fact that the Feed Lot owner did hire the truckers and believed he had a right to fire a trucker who was not hauling the silage in a proper manner did not change the situation, because an employer does have the right to fire an independent contractor for good cause.

It is concluded that the directed verdict for the Feed Lot should have been granted.

It is further contended that the judgment against the Flemings and the Feed Lot should be reversed for the reasons (1) the trial court refused to permit the Appellants to attack the credibility of Benton by asking questions of him as to his conviction of two felonies and the precise nature of such felonies; and (2) that the trial court denied a mistrial where Benton's attorney asked the Highway Patrolman, who investigated the accident, as to whether he had an opinion "as to the sole proximate cause of this collision".

On the first point, the trial court did rule that Benton could be asked the impeaching question of whether he had ever been convicted of a felony. Appellants object to the fact that they were not permitted to go further and ask questions as to two felonies and the precise nature of such felonies. This Court has recognized the use of this type of evidence to attack credibility in Richardson ·v. Gage, 28 S.D. 390, 133 N.W. 692, and in Moberg v. Scott, 42 S.D. 372, 175 N.W. 559. However, these cases also stated that questioning on this subject is left to the sound discretion of the trial court and unless there has been a clear abuse of such discretion, the ruling of the trial court should be sustained.

In this case Benton could give no details of the accident as he was knocked unconscious and remembered nothing. The only possible impeachment was as to the conflicting statements about the sun's position at 7:00 o'clock in the morning. The Appellants wished to cross-examine him specifically about a rather notorious rape case in that community of only a couple of years back. When this was not permitted Benton was not even asked as to a

prior felony conviction; all of which indicates that the trial judge did not abuse his discretion in not permitting the further questioning.

■ The final question is whether the trial judge should have granted a mistrial when the Highway Patrolman was asked whether he had an opinion "as to the sole proximate cause of this collision". This was certainly an improper question and upon objection, no answer was permitted by the trial judge.

■ The testimony of the one witness who was following the Benton vehicle was to the effect that it was proceeding east on its own side of a hard-surfaced highway at a speed of from 45 to 50 miles per hour. The physical evidence which included the wheel tracks, the point of impact, and the position of the vehicles after the accident, indicated that the Fleming truck proceeding west and turning into the graveled road to the Feed Lot, made a "shortcut" left turn across traffic before reaching the crest of the hill at a point where he could not be seen by a driver approaching from the west, and that in spite of applying brakes and swerving to the right, the Benton vehicle struck the truck on the extreme south shoulder of the highway. Under these facts, the verdict of negligence and liability against the Flemings should not be set aside because of one question which was not answered, and another question that was not asked.

The judgment against Berdell Fleming and Dennis Fleming is affirmed, and the judgment against Fall River Feed Lots, Inc., is reversed.

All the Justices concur.